UNITED STATES *v.* PAUL PUTTMANN (No. 3607)[1]

United States Court of Customs and Patent Appeals, May 22, 1933

*Charles D. Lawrence*, Assistant Attorney General (*Hugo P. Geisler*, special attorney, of counsel), for the United States.

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for appellee.

[1] T. D. 46466.

**136**

[Oral argument April 7, 1933, by Mr. Lawrence and Mr. Edward P. Sharretts]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the First Division of the United States Customs Court, one judge dissenting, sustaining the importer's protest against the classification by the collector of customs at the port of New York of certain gelatin imported under the Tariff Act of 1930.

Gelatin is provided for in paragraph 41 of said act in the following language:

PAR. 41. Edible gelatin, valued at less than 40 cents per pound, 20 per centum ad valorem and 5 cents per pound; valued at 40 cents or more per pound, 20 per centum ad valorem and 7 cents per pound; gelatin, * * * not specially provided for, valued at less than 40 cents per pound, 25 per centum ad valorem and 2 cents per pound; valued at 40 cents or more per pound, 25 per centum ad valorem and 8 cents per pound; * * *.

It will be noted from the foregoing that two kinds of gelatin are named, to wit, "Edible gelatin" and "gelatin not specially provided for," and that the *rates* of duty upon each depend on value. *Classification*, however, is not made dependent upon value.

The consular invoice which accompanies the papers in this case has upon it, "2,000 lbs.—906 kg. Gelatin for Emulsion." Another paper entitled "Summary of Invoice," has upon it, "2,000 lbs. Gelatin for technical purposes." The entry seems to have been a warehouse entry. This latter paper contains the expression, "Photographic Gelatin nspf" and "photographic Gelatin inedible nspf— valued over 40¢ lb."

The collector assessed duty at 8 cents per pound and 25 per centum ad valorem, holding the merchandise classifiable under the second, or general, designation—"gelatin * * * not specially provided for." The importer protested and insists that it is properly classifiable under the first designation as "Edible gelatin," with duty at 7 cents per pound and 20 per centum ad valorem.

It is practically conceded that the customary use of the kind of gelatin here involved is for the making of photographic films, but it appears that the article imported was an article of a high degree of purity and that it was entirely suitable to be eaten. Indeed, it appears that it was, in certain characteristics, of a higher quality than gelatin which is customarily used in the preparation of foods. It was proved that a portion of the importation was turned over to a chef of a New York hotel and by him used to make "desserts, soup, jelly, and all sorts of aspic"; that its taste was "very fine" and that it was served to guests at the hotel.

A sample of the merchandise was analyzed by one of importer's witnesses who, in our opinion, was shown to be a qualified expert,

and his testimony as to it being suitable for human consumption is positive and clear. Another expert, answering a hypothetical question which embraced a description of such merchandise as that involved, verified the opinion of the first expert.

A witness, called by the Government, who testified with reference to domestic gelatins, stated that his company manufactured and sold gelatin to manufacturers of ice cream and other food products, and that they also made a gelatin out of carefully selected stock which they sold to be used in the manufacture of photographic films. There was no claim that the latter is not entirely suitable for consumption as a food. The witness testified that it is not lacking in any quality that a food gelatin must have; that it contains nothing injurious to health; that it is, in certain respects, "very much finer" than that supplied for making food products, and that there have been instances in which, when the manufacturers of film emulsions have refused, for some reason, to accept a supply of it, it has been diverted and sold to the manufacturers of food products.

The evidence is conclusive—in fact, it is not in any way controverted—that the article imported is entirely suitable to be eaten.

Definitions of the word "edible" are scarcely essential, since its meaning is so well known. A single one taken from the Century Dictionary and Encyclopedia (revised 1909 edition) will suffice:

Edible—1. a. Eatable; fit to be eaten as food; esculent; specifically applied to objects which are habitually eaten by man, or specifically fit to be eaten, among similar things not fit for eating; as edible birds' nests; edible crabs; edible sea-urchins. * * *

Upon this record and under the definition quoted, it must be held that the imported article was edible gelatin.

The Government insists, however, that it was not *the* edible gelatin provided for as such in the paragraph, but that within the intent of Congress, for tariff purposes, it was gelatin not specially provided for, as the collector held.

The Government, in substance, argues for a classification by use, insisting that the chief use of the imported article shown is not an edible use. The dissenting judge below, Judge McClelland, based his dissent upon this view. The majority opinion below held, in effect, that, since the article is edible in fact, the *eo nomine* provision for edible gelatin is more specific than the general term and is, therefore, controlling.

One argument of Government counsel is that the expressions quoted, *supra*, from the invoice and entry papers constitute "admissions against interest" on the part of the importer—

and as such are entitled to substantial evidentiary weight in conformity with the doctrine laid down in *United States* v. *Rockhill & Vietor et al*, 10 Ct. Cust. Appls. 112, T. D. 38374, *United States* v. *Bloomingdale Bros. & Co.*, 10 Ct. Cust. Appls. 149, T. D. 38400, and *Meyer & Lange et al.* v. *United States*, 3 Ct. Cust. Appls. 247, T. D. 32565.

Upon this point we deem it sufficient to say that the cited cases do not go further, at most, than to hold that such statements in invoices and entries establish only a *prima facie* case against any contradictory claim made by importers in their protest. They do not act as an estoppel, and in the *Rockhill & Vietor et al.* case, *supra*, this court took care to state—

\* \* \* It is true that the invoice descriptions of merchandise are generally, perhaps always, open to explanation and contradiction, both by the Government and the importers; \* \* \*.

The importer has here established by proofs that the gelatin involved is, in fact, not "inedible," as stated on the warehouse entry, but edible, and has established, as well, that the gelatin is both photographic gelatin and edible gelatin.

We do not think the statements on the papers should be held, in this case, to conclude either the importer or the Government from showing by proper evidence the true character of the importation.

Another argument by Government counsel is based upon the legislative history of the paragraph. In fact, counsel for both parties draw arguments from this.

The "Summary of Tariff Information," prepared for use by Congress in the preparation of the Tariff Act of 1930, in volume 1, beginning at page 218, gives definitions and data respecting gelatin, declaring "Commercial supplies" of same to be classifiable as "(a) Technical gelatin;" "(b) Edible gelatin;" "(c) Photographic or emulsion gelatin." It is stated:

Edible gelatin is used in the manufacture of ice cream, jellies, jams, and other food preparations, and in the manufacture of capsules for the administration of medicine. Technical gelatin is used largely for sizing straw hats. Photographic gelatin is used in large quantities in the preparation of the emulsion used for coating photographic films, plates, and developing papers.

From the foregoing it is argued on behalf of the Government that in the enactment of the paragraph "Congress did not [for tariff purposes] consider 'photographic gelatin' to be an 'edible gelatin'."

But counsel for the importer argues that—

In providing for "edible gelatin" without exception, Congress, having been fully advised of the facts by the Tariff Commission, did so with complete knowledge that certain qualities of edible gelatin were being extensively used in the photographic industry. There is no rule of interpretation under which this Court could read into the statute an exception which Congress deliberately refrained from making.

Assuming, without holding, that there is ambiguity in the paragraph which renders proper an examination of its legislative history as an aid in construing it, we are not convinced that the recitals in the "Summary," when same are viewed in the light of the language of the paragraph itself, sustain the Government's contention.

While the "Summary" named and described three kinds of gelatin, Congress only provided for two, one *eo nomine*—"edible"— and one general—"not otherwise provided for."

Congress in the paragraph itself had nothing to say of "photographic" or "technical" gelatin, that is to say, Congress made no provision by name for either of these.

It seems proper to say that the record discloses that there are kinds of gelatin which are not edible and which, it is assumed, indubitably are classifiable under the not specially provided for provision and assessed at rates determined by values.

In view of the foregoing we are of opinion that the majority of the court below reached the correct conclusion in the case.

The judgment of the United States Customs Court is *affirmed*.