(C. D. 1593)

H. T. KENNEDY CO., INC.
DANIEL F. YOUNG, INC. } *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided March 11, 1954)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* and *Harry A. LeBien* of counsel) for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh* and *Richard M. Kozinn*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation described in the record as steel spikes was classified by the collector of customs as articles or wares, not specially provided for, composed wholly or in chief value of steel, pursuant to the provisions in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was imposed thereon at the rate of 22½ per centum ad valorem.

Plaintiffs contend that the merchandise should have been classified pursuant to the provisions of paragraph 331 of said act (19 U. S. C. § 1001, par. 331), as modified, *supra*, as "Spikes, * * * and staples, not specially provided for," and subjected to duty at the rate of ½ cent per pound.

The competing statutes, so far as applicable here, are quoted below.

Paragraph 397, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

*     *     *     *     *     *     *

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

*     *     *     *     *     *     *

Other (except slide fasteners and parts thereof)_____ 22½% ad val.

Paragraph 331, as modified, *supra*:

Spikes, tacks (not including thumb tacks), brads, and staples, not specially provided for_____ ½¢ per lb.

It was stipulated and agreed by the parties that the importation, represented by exhibit 1, is made from a steel rod by bending and that it is not a "cut spike" nor is it made from iron or steel wire.

The record further shows that the article is of the spring-type design, formed from a single piece of steel rod, nine-sixteenths of an inch in diameter, the steel bent in such a manner as to form two legs of equal length, having a U-shaped loop extending downward at a slight angle between the legs.

Exhibit 2 was received in evidence as a miniature representation of the method by which American railways have installed exhibit 1.

Exhibit A was offered by defendant and received in evidence to illustrate one form of a so-called rail anchor.

The sole witness in the case, Harold T. Kennedy, was called by the plaintiffs. He testified that he had been president of H. T. Kennedy Co., Inc. (one of the plaintiffs herein), since its inception in January 1946; that it was an export and import firm handling "machinery, steel railroad equipment and that sort of thing"; that he had 2½ years at the University of Detroit and ½ year at New York University in the study of mechanical engineering. Prior to his association with the Kennedy company, he was employed by Gibbs and Hill, consulting engineers with the Pennsylvania Railroad, and by Rex Burnett, consulting engineer with the Washburn Wire Co. in New York; he had also worked with the Baltimore & Ohio Railroad in a mechanical capacity in the signal department and the locomotive repair shops; that he was well acquainted with the use of spikes by American railroads and was familiar with the use of merchandise like exhibit 1, having first seen it in 1947 and became an importer of it in 1950 or 1951. Prior to its importation, he had been to England to see the article in use at the manufacturer's works at Bredbury near Stockport and also on English railroad tracks; that the article is driven into the wooden tie to hold the rail to the tie. In this country, the article had been sold to the Atchison, Topeka & Santa Fe, Pittsburgh-Lake Erie, Delaware & Hudson, and Patapsco & Back Rivers railroads; that it had also been given to railroads for trial purposes, mentioning the Erie, the Delaware, Lackawanna & Western, and the Chesapeake & Ohio. His company had sold 9,000 of these devices to the Santa Fe Railroad, and it had installed about 7,500 of them and was planning to install more. The Central of Georgia Railroad was mentioned as another company which had bought some 4,000 of the devices.

With reference to the use of exhibit 2, Kennedy gave the following testimony:

Q. This Exhibit #2 is a representation of a complete tie and rail and tie plate and fastenings for same?—A. Correct.

Q. Now is the tie plate held or fastened to the wooden tie by any means other than Exhibit #1?—A. No, it is not.

Q. Is the rail held to the tie plate by Exhibit #1?—A. Yes, it is.

Q. Is it held by any other metal or device?—A. No it is not.

When asked to explain the purpose "of the bent 'U' top of Exhibit #1," the witness replied—

* * * it has two functions. For one point you must have some way to reach in and touch the rail when these two legs are driven into the tie, up close to the rail, so that the tongue of the spike projects about ¾".

Q. Is that designed to come in contact with the bottom flange of the rail?—A. That's correct, yes.

Q.  Does that tongue have a spring effect?—A.  Yes, the spring effect.

\*          \*          \*          \*          \*          \*          \*

The spring effect is to clamp the rail tie plate of [on] the tie tighter together when this spike is driven so when you get a ¼″ tension you get a pressure of about 2240 pounds, British ton.

\*          \*          \*          \*          \*          \*          \*

The spring for one thing, prevents the spike from withdrawing under action of passing traffic and secondly, the action of the tongue on the rail creates a terric [sic] frictional increased grip which prevents the rail from sliding endwise.

The article represented by exhibit 1 is installed by drilling two holes into the tie.  To quote the witness further—

\* \* \* The spike is then placed in position in the holes of the tie plate, into the previously drilled holes and started with a small hand hammer for about 1″ or so and the drive is completed with a sledge hammer.  You can drive them one length at a time by alternate blows or you can drive the sledge so that you can hit both sides simultaneously.

He added that the same method is generally employed in installing the common spike ordinarily used on American railroads.

On cross-examination, when asked by what name the article is sold, the witness replied—"I call them the MacBeth Spike anchor," the term indicating that it is a spike with anchor properties.  Said the witness—

The railroads for many years have used a device for the prevention of rail creep which is commonly known as an anchor.  It is a device which grips the underside of the rail and abuts against the tie and prevents the rail from sliding endwise.  In picking a name for this spike we tried to decide on something which would tell the ultimate purchaser that it is a spike and also a device which will take the place of the ordinary anchor.

X Q.  So that in practice if Exhibit #1 is adopted by the American railroads, it will take the place of the combination of the spike and the anchor, is that not correct?—A.  That is right.

X Q.  It will eliminate the anchor?—A.  We hope that it will.

The witness frankly admitted that merchandise like exhibit A, which represents one form of rail anchors, was used with "regular spikes" to fasten the rail to the tie to prevent creeping of the rail and that if the device, represented by exhibit 1, proves successful, it will eliminate the use of the anchor.

Kennedy gave a very clear, intelligent, and straightforward statement of the design, character, and use of the imported commodity, and it stands unrefuted and uncontradicted.

The provision for "spikes," relied upon by plaintiffs, is unqualified except for the words "not specially provided for" and, hence, is subject to the rule which has been frequently declared that "Where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears."  *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T. D. 38966.

Furthermore, another basic principle of statutory construction declares that tariff acts speak not only for the present but for the future. *Pickhardt* v. *Merritt*, 132 U. S. 252 (33 L. ed. 353); *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T. D. 43294. In view of the rapid advances in the world of art, science, invention, and discovery, as well as the spectacular developments in the industrial field, it is practically impossible in drafting a tariff statute to anticipate future changes and developments. Hence, the necessity for the rule.

Research would indicate that there has been but little litigation on the subject of spikes.

In support of their contention that the subject merchandise is within the common meaning of the term "spike," plaintiffs invite our attention to the following authorities: *C. S. Emery & Co.* v. *United States*, 64 Treas. Dec. 1135, Abstract 26313; *J. T. Steeb & Co., Inc.* v. *United States*, 53 Treas. Dec. 1008, Abstract 5948, Knight's American Mechanical Dictionary, 1876 edition, volume 3, page 2266; and Railway Engineering & Maintenance Cyclopedia, seventh edition, 1948, at page 319.

In the *Emery* case, *supra*, we find from an examination of the full opinion of this court that the merchandise then before us "resembles a large round iron nail, save that the surface of the shank is not plain but is spirally cut throughout, the undulations occurring at half-inch intervals. The pointed shank is about 14 inches long, about ⅞ of an inch in diameter, and the beveled head a trifle over one inch square and one-half inch thick."

The court, in holding that the articles should be classified as "spikes," took occasion in the course of its opinion to refer to Knight's American Mechanical Dictionary, *supra*, and quoted from it as follows:

SPIKE. 1. A large nail, over 10d.

12d. spikes are 3¼ inches long, 45 to the pound.

16d. spikes are 3½ inches long, 28 to the pound.

20d. spikes are 4 inches long, 20 to the pound.

30d. spikes are 4½ inches long, 16 to the pound.

*Railroad spikes are larger and are of several patterns.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

*Patented forms of spike specially intended for securing railway-rails to the ties are numerous;* in most it is sought to increase the holding power by serrating the edge of the spike or by causing its points to spread apart in driving. [Italics supplied.]

In that case, this court also commented upon the fact that in Knight's dictionary "A number of illustrations are depicted, among them one which is an exact picture of the sample of the imported merchandise in evidence herein. This is referred to as a 'screw-spike, having the under side of its head so beveled as to bear firmly on the flange of the rail.' "

An examination of Knight's dictionary at page 2266, under Fig. 5284, reveals numerous types of spikes, which are described as follows:

\* \* \* \* \* \* \*

*b* is curved, to cause it to bear more strongly against the rail, \* \* \*.

*c*, the sides are corrugated, so that the wood may swell into the indentations, \* \* \*.

*d*, a part of the shank has a winding surface, so as to cause the spike to twist, engaging the serrations in the wood.

*e*, the spike has a winged point and spiral barbs upon two of its edges.

*f*, the shank has a serrated wing on each side.

*g*, a screw-spike, having the under side of its head so beveled as to bear firmly on the flange of the rail.

*h i k l m*, split spikes, having prongs which diverge when driven into the wood.

*n o p*, spikes having serrations on one side, and held firmly by keys; in the latter a projection on the spike enters a notch in the key to keep the key in place after being driven.

This is followed by the comment—

Redburn's railway-spike (Fig. 5385) has a body grooved to fit the lower flange of the rail, and two prongs, one above the other, which are driven into the tie, and cannot be withdrawn by the vertical vibratory motion of the rail.

Bearing in mind that Knight's dictionary was published in 1876, it is obvious that for many years prior to the passage of the Tariff Act of 1930 it was well known that the term "spikes" embraced not only the common railway spike but also a wide variety of patterns designed to give greater security to the rails when fastened to the ties.

We perceive no sound reason for not including the article here in controversy within the class of spikes enumerated in paragraph 331, *supra*. The mere fact that in addition to its function of holding the rail to the tie it serves also to overcome the tendency of the rail to "creep" or to "slide endwise" is not sufficient reason for excluding it from the classification of spikes. Simply because the article may be denominated as a spike anchor presents no insuperable reason for not classifying it as a spike. It is but an improvement in the family of spikes so graphically illustrated in Knight's dictionary above referred to.

In this connection, it is of interest to note that the Railway Engineering & Maintenance Cyclopedia, *supra*, contains the following statement at page 319 under the subheading "Compression Spring Spikes," which, incidentally, describes the merchandise here in controversy, represented by exhibit 1, with great accuracy.

Another variation of the spring-type *spike* is one of two-leg design formed from a single piece of oil-tempered steel, $\frac{9}{16}$ in. in diameter, with the metal bent in such a way as to form two legs of equal length with a U-shaped loop between the legs extending downward at an angle from the tops of the legs. When applying, the legs are inserted in the two rail spike holes of the tie plate on one side of the rail and a sledge, held with the flat side down, is used for driving.

When driven, the end of the loop makes contact with the flange of the rail. A special tool is required for withdrawing these *spikes*. [Italics supplied.]

The foreword to the Cyclopedia, above referred to, recites in part—

The publishers of Railway Engineering and Maintenance Cyclopedia are proud to present to the railway industry this new 1948 edition. *Like the preceding six editions, spread over the last 28 years*, the seventh edition is offered as an authoritative, up-to-date text and reference book on the best practices, materials, equipment, tools, appliances and services entering into the construction and maintenance of the fixed properties of the railways. [Italics supplied.]

It appears further that the editors "have drawn freely upon the latest works of the American Railway Engineering Association, the Signal Section of the A. A. R., the Roadmasters' and Bridge and Building Associations, the American Wood Preservers' Association and others. Furthermore, they have kept abreast of developments through the weekly and monthly railway publications of the publisher and the latest trade literature of some 700 manufacturers."

Defendant contends that because the subject merchandise serves both as a spike and as an anchor, and if found to be satisfactory and successful will finally eliminate the use of an anchor, it must be considered as something more than a spike, citing *Krueger & Hoch* v. *United States*, 2 Cust. Ct. 68, C. D. 88. In that case, this court held that articles described as "small pieces of metal, having a point, a shoulder, and a screw thread," used in fastening picture mouldings to the wall, were properly dutiable as articles of metal rather than as iron or steel nails, spikes, tacks, brads, or staples, in paragraph 331 of the Tariff Act of 1930, *supra*. From an examination of the samples in that case, the court concluded that the article in controversy was a combination of a nail and a screw and "since it is not *eo nomine* provided for it is properly dutiable at the rate of 45 per centum ad valorem under said paragraph 397 as a manufacture of metal * * *."

It is stated in the brief of defendant that—

The case of *C. S. Emery & Co.* v. *United States*, 64 Treas. Dec. 1135, Abstract 26313 (1933), cited by plaintiff in its brief, at pages 8–10, is interesting but not applicable herein. The *Krueger* case, *supra*, apparently modifies the *Emery* case although it does not so state. * * *

We are not in accord with this view, inasmuch as in the *Krueger* case, *supra*, the article before the court was neither a nail which served the purposes of a screw, nor was it a screw which performed the functions of a nail. It was, in fact, the joining of two articles into one, separated by a metal shoulder, the screw side of the article to be inserted into pieces of moulding, and the opposite nail portion used to affix the moulding to walls, and was clearly, as held by the court, a combination of two articles, to wit, a nail and a screw.

However, in the *Emery* case, *supra*, the merchandise in issue was not a combination of articles but was a spike with a spirally cut shank, and

the court was of the opinion that the general provision for spikes included all forms of the article. Consequently, there would seem to be no conflict between the *Emery* and *Krueger* cases, as urged by the defendant.

Another case cited by defendant is *Irving W. Rice Co.* v. *United States,* 71 Treas. Dec. 77, T. D. 48760, relating to merchandise described as atomizers which were classified as bottles of the character used or designed to be used as containers of perfume. It was there held that—

* * * While the glass container in Exhibit 1, which holds the perfume, has some similarity to a bottle in that it holds liquids, "it is only part of the complete atomizer." "At the most the entire article may be said to be composed *in part*" of a bottle "used or designed to be used" as a container of perfume. "The presence of the metal cap with its attached rubber hose and rubber bulb may not be ignored in determining the tariff status of the article" and removes it from classification as a bottle. Admitting for the sake of argument that Exhibit 1 is a bottle "we have something more than" a bottle; "we have a complete atomizer composed in part of a hollow glass container." [Italics quoted.]

We find nothing in that case which disturbs our conclusion that the article here under consideration is a spike.

We are satisfied that this is not a case where the principle urged by defendant that the imported commodity is "something more than" a spike controls. The article before us is nothing more or less than an improved spike which, due to the genius of the inventor, performs a dual function. In other words, it is not, as in the *Krueger* case, *supra,* the combination of two articles, each one of which performed its separate function; it is an individual unit, namely, a spike. It is a matter of no consequence that as a result of this ingenious device it may dispense with the use of railway anchors.

Upon the record presented and for the foregoing reasons, we find and hold that the articles in controversy are spikes within the purview of paragraph 331 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra,* and should properly have been assessed for duty at the rate of ½ cent per pound. That claim of plaintiffs is, therefore, sustained. All other claims are overruled.

Judgment will issue accordingly.