Slip Op. 03-88

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

|  |  |
|---|---|
| RAILTECH BOUTET, INC., | : |
| Plaintiff, | : |
| v. | **Court No. 96-01-00265** |
| | : |
| UNITED STATES, | : |
| Defendant. | : |
| | : |

[On proper classification of aluminothermic charge, Plaintiff's Motion for Summary Judgment Granted; Defendant's Cross-Motion for Summary Judgment Denied.]

Decided: July 22, 2003

*Edmund Maciorowski, P.C.* for Plaintiff.

*Peter D. Keisler,* Assistant Attorney General, United States Department of Justice, *John J. Mahon*, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, (*Amy M. Rubin*), Trial Counsel; *Edward N. Maurer*, Deputy Assistant Chief Counsel, International Trade Litigation, United States Bureau of Customs and Border Protection, of Counsel, for Defendant.

### OPINION

**BARZILAY, JUDGE**:

### I. INTRODUCTION

The import invoice for the subject merchandise in this case identifies the product in French as "charge aluminothermique pour procede: QP." Its proper identification for purposes of classification under the Harmonized Tariff Schedule of the United States ("HTSUS" or "Tariff

Schedule") is the central issue before the court. Plaintiff, Railtech Boutet, Inc. ("Railtech"),

imported the subject merchandise from France through the Port of Detroit. On January 19, 1993,

Plaintiff protested the initial classification of the United States Customs Service ("Customs"),[1]

which assigned a duty rate to the merchandise that Plaintiff had attempted to enter duty-free.

That protest was granted on February 18, 1993, and for approximately two years the

merchandise continued to enter duty-free, under HTSUS subheading 3810.90.20. However, on

April 24, 1995, Customs reconsidered its granting of the earlier protest and reclassified the

merchandise under HTSUS 3810.10.00 at a duty rate of 5.0 percent. Plaintiff protested this

classification. The protest was denied, and Plaintiff filed a complaint with this court.

## II. BACKGROUND

The subject merchandise is identified in multiple ways as "thermite, thermite powder,

thermite mixture, thermite compound, thermite charge, thermite welding charge, welding charge,

thermite oxide charge, welding portion, or aluminothermic welding charge." *Def.'s St. of Mat.*

*Facts to Which There Are No Genuine Issues to Be Tried* ("*Def.'s St. of Facts*") ¶ 2; *Pl.'s St. of*

*Genuine Issues in Opp. to Def.'s Mot. for Summ. J.* ("*Pl.'s St. of Facts*") ¶ 2. The product

consists of 60.8% iron oxide, 19.5% aluminum, 7.05% steel F category (with slight carbon

content), 7.53% steel (with 0.6% carbon) and 5.12% iron (with manganese). *Def.'s St. of Facts* ¶

3.

The product is used for welding railroad tracks. *The American Railway Engineering and*

---

[1] Effective March 1, 2003, the Customs Service was renamed the Bureau of Customs and Border Protection of the United States Department of Homeland Security. *See Reorganization Plan Modification for the Department of Homeland Security*, H.R. Doc. 108-32 at 4 (2003).

*Maintenance-of-Way Association* ("*AREMA*") *Manual for Railway Engineering* ("*AREMA*

*Manual*") explains the product and how it is used:

a.      Thermite is defined as a mixture of finely divided aluminum and iron oxide. When the aluminum and iron oxide react, the reaction is called a thermite reaction. Thermite welding is accomplished with the heat produced by the thermite reaction. Filler metal is obtained from the iron reaction product and pre-alloyed steel shot in the mixture.

b.      When ignited, the reaction within the thermite mixture develops a temperature approaching 5000 degrees F and produces a filler metal at about 3500 degrees F which, when introduced into a gap between the rails, welds or fuses the ends together. The reaction metal is generally iron which has been enriched with alloys to produce a filler metal assimilating the characteristics of the rail steel being welded.

*Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.* ("*Pl.'s Opp. Br.*") *Ex.* 2, section 2.5.1

The relevant portion of the Tariff Schedule reads as follows:

```
3810        Pickling preparations for metal surfaces; fluxes and
            other auxiliary preparations for soldering, brazing or
            welding; soldering, brazing or welding powders and
            pastes consisting of metal and other materials;
            preparations of a kind used as cores or coatings for
            welding electrodes or rods:

3810.10.00          Pickling preparations for metal surfaces;
                    soldering, brazing or welding powders and
                    pastes consisting of metal and other
                    materials:

3810.90             Other:

3810.90.10              Containing 5 percent or more by weight
                        of one or more aromatic or modified
                        aromatic substances.

3810.90.20              Consisting wholly of inorganic
                        substances.

3810.90.50              Other
```

Customs' classification of the subject merchandise in this case has swung back and forth

like a pendulum.  Plaintiff entered the product in 1992 under HTSUS subheading 3810.90.20,

which is a duty-free subheading and covers "fluxes and other auxiliary preparations for

soldering, brazing or welding; preparations of a kind used as cores or coatings for welding

electrodes or rods: Consisting wholly of inorganic substances."  Plaintiff contends the product

should be considered an "auxiliary preparation."  The Customs office at the Port of Detroit

rejected this classification and classified the product under HTSUS subheading 3810.10.00, at a

duty rate of 5 percent *ad valorem*.  Subheading 3810.10.00 covers "pickling preparations for

metal surfaces; soldering, brazing or welding powders and pastes consisting of metal and other

materials."  Specifically, Customs claims the product should be classified as a welding powder.

Plaintiff protested Customs' classification of the product as a welding powder on

February 18, 1993, and Customs granted the protest.  The change in Customs' position was

apparently triggered by a report from the Customs laboratory in Chicago stating that the

"merchandise has a particle size greater than powder.  Therefore [it is] classified as granular and

excluded from classification in 381010 and should be 38109020\free."  *Pl.'s Cross-Mot. for*

*Summ. J.* (*"Pl.'s X-Mot."*) *Ex.* 11.

Customs then began another round of internal reconsideration of the product's

classification, evidenced by an internal communication from the field import specialist in Detroit

to the national import specialist regarding entries in 1994.  *Pl.'s X-Mot. Ex.* 15.  The field import

specialist stated that the "Chicago lab was non committal on using a definition for a powder

versus a granule."  However, this second report from the Chicago laboratory seems fairly clear:

"The sample consists of disks of aluminum and iron, globules and granules of iron and iron

oxide, and grains of aluminum.  Most of the particles are over 1000 micrometers and thus the

sample should not be considered a powder." Lab Report No. 3-95-31062-00 in *Pl.'s X-Mot. Ex.* 14.

The field import specialist also noted Headquarters Ruling 953360 of June 17, 1994 which classified identical merchandise under subheading 3810.10. In response, the national import specialist stated that the "product appears to be a mixture of metal oxide with aluminum and steel, all in a powder form." Based on this characterization, the national import specialist agreed to classify the product under subheading 3810.10 at a 5 percent duty rate. The national import specialist also noted that the definition of granule in Note 1(h) in Chapter 72 of the HTSUS "was intended for classification of goods in that chapter."

On April 24, 1995, Customs reconsidered allowing the goods to be classified under Plaintiff's preferred subheading and issued a Notice of Action, reclassifying the product to subheading 3810.10.00. *Pl.'s X-Mot. Ex.* 13.

While Railtech's claims were working their way through the Customs process, another manufacturer imported a similar product from Canada. The importer claimed a duty-free rate under the Canada Free Trade Agreement ("CFTA") "various classifications." *Pl.'s X-Mot. Ex.* 17. The field import specialist at the port denied the status under CFTA (ruling the product was not manufactured in Canada) and classified the entries under HTSUS 3810.10. the importer's preferred subheading. *Id.* The question of proper classification was then taken up by the Chief, National Import Specialist Division, in a memorandum to the Director of the Office of Regulations and Rulings, U.S. Customs Headquarters. *Pl.'s X-Mot. Ex.* 18. That memorandum concluded:

> Based on the facts contained in the protest package we believe that the
> Rail Welding Kit is a set classified in HTS 3810.90.2000, that is not a product of

Canada and is therefore not subject to CFTA.

*Id.*

In response to this memorandum, the Office of Regulations and Rulings prepared a

memorandum, dated June 29, 1993, which concluded with regard to the kits from Canada:

> Finally, not to put undue emphasis on the practicalities of the case, the []
> importer wants 3810.10 and FTA, the port says you can have 3810.10 but not
> FTA, and the NIS says 3810.90.20 but no FTA, to which I say, who cares since
> that's free . . . !

*Pl.'s X-Mot. Ex.* 19.

Ultimately, Customs issued  HQ ruling 953360, discussed above, which classified the

goods under the importer's preferred heading of 3810.10, but denied CFTA status, the only

option which was not "free."  With regard to the product imported from Canada, however, the

importer did not challenge the description of the product as a powder.


### III.  STANDARD OF REVIEW

Customs' classification decisions are presumed to be correct.  28 U.S.C. § 2639(a)(1)

(1999).  The presumption does not apply when there is no material fact at issue, because the

presumption does not carry force with questions of law.  *Universal Elecs. Inc. v. United States*.

112 F.3d 488, 492 (Fed. Cir. 1997).  When there are no factual issues in the case, the "propriety

of the summary judgment turns on the proper construction of the HTSUS, which is a question of

law," subject to *de novo* review.  *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464,

1466 (Fed. Cir. 1998) (noting that legal issues are subject to plenary review by this Court and the

Court of Appeals); *see also* 28 U.S.C. § 2640.  The court will also consider the reasoning of a

Customs classification ruling, to the degree the ruling exhibits a "power to persuade" as outlined

in *United States v. Mead Corp*., 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323

U.S. 134, 140 (1944)).


## IV.  DISCUSSION

Under General Rule of Interpretation ("GRI") 1 to the HTSUS, the first step to classify

an article is to determine the appropriate heading.  In this case, both parties agree the appropriate

heading is 3810.  Under GRI 6, the next step is to determine the appropriate subheading within

3810, looking to "subheading notes, and *mutatis mutandis*, to [GRI 1 through 5] on the

understanding that only subheadings at the same level are comparable."

To decipher a term's correct meaning the court will look to its common meaning.

*Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (citations

omitted).  A term's common and commercial meaning are presumed to be the same.  *Sinod Am.*

*Corp. v. United States*, 872 F.2d 1572, 1576 (Fed. Cir. 1989) (citations omitted).  In addition to

the terms of the subheading, the court may also look to the Explanatory Notes; although they "do

not constitute controlling legislative history," they can "clarify the scope of HTSUS

subheadings."  *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citing

*Lynteg, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992)).

The relevant portion of the Explanatory Notes to Heading 3810 states:

> (2)    **Fluxes and other auxiliary preparations for soldering, brazing**
>        **or welding.**  Fluxes are used to facilitate the joining of the metals
>        in the process of soldering, brazing or welding, by protecting the
>        metal surfaces to be joined and the solder itself from oxidation.
>        They have the property of dissolving the oxide which forms during
>        the operation.  Zinc chloride, ammonium chloride, sodium
>        tetraborate, rosin and lanolin are the products most commonly used

in these preparations.

      This group also includes mixtures of aluminium granules or powder with various metallic oxides (e.g., iron oxide) used as intense heat-generators (alumino-thermic process) in welding operations, etc.

(3)    **Soldering, brazing or welding powders and pastes consisting of metal and other materials**.  These preparations are used to make the metal surfaces to be joined adhere to each other.  Their essential constituent is metal (usually alloys containing tin, lead, copper, etc.).  These preparations are classified in the heading **only when:**

    (a)    They contain other constituents as well as metals.  These constituents are the auxiliary preparations described in (2) above; and

    (b)    They are put up in the form of powders or pastes.

(emphasis in original).

The parties agree there are four distinct categories within the heading 3810: (1) pickling preparations for metal surfaces; (2) fluxes and other auxiliary preparations for soldering, brazing or welding; (3) soldering, brazing or welding powders and pastes consisting of metal and other materials; (4) preparations of a kind used as cores or coatings for welding electrodes or rods. Customs contends the subject merchandise should be considered "welding powders" under category 3. *Def.'s Mem. in Supp. of its Mot. for Summ. J.* ("*Def.'s Br.*") at 9.  Plaintiff protested this classification and argues that the merchandise should be considered an "auxiliary preparation" under category 2. *Pl.'s Opp. Br.* at 6.  Both parties agree that the product belongs under heading 3810; however, each also offers alternatives if its preferred classification is not upheld.

Consistent with the Explanatory Notes, Customs agrees with Plaintiff that the product

does contain "auxiliary preparations." *Def.'s Br.* at 9.[2]  Customs also contends the product

contains additional material, metal "filler," which "fills in the gap between two pieces of railroad

track," that "prevents the product from being classified in Railtech's claimed provision." *Id.* at

10.  The "filler" does qualify as a metal.  Under the guidance provided by the Explanatory Notes,

the classification advanced by Customs would be plausible if the "essential constituent is metal"

and if, consistent with the terms of subheading 3810.10, the product is also, in the words of the

Explanatory Notes, put up in the form of a powder or paste.

Plaintiff contends that the product is not in the form of a powder, and that, therefore, it

cannot fit under the restrictive language of the Explanatory Notes requirement.  Plaintiff insists

that "auxiliary preparation" covers the entire mixture, including the steel filler.  The Explanatory

Notes indicate the term "auxiliary preparations" covers aluminum and iron oxide mixtures,

which constitute 80.3% of the product.  The Notes do not specifically exclude inclusion of other

elements from the mixture for the product to be considered an auxiliary preparation.

### A.    Definition of Powder.

For the merchandise to be classifiable under subheading 3810.10, it must be put up in the

---

[2] Defendant includes in its Appendix B excerpts from *American Welding Society's Welding Handbook* (7th ed., Vol 3, 1981) ("*Welding Handbook*") which defines "thermit welding" ("thermit" is a trademark name for thermite)  as:

> A welding process which produces coalescence of metals by heating them with superheated liquid metal from a chemical reaction between a metal oxide and aluminum, with or without the application of pressure.  Filler metal, when used, is obtained from the liquid metal.

*Id.* at 396.  The *Welding Handbook* states that "[t]he most common application of [this] process is the welding of rail sections into continuous lengths." *Id.* at 397.  The *Welding Handbook* also states that alloying elements and other additions can be added to the mixture as required. *Id.*

form of a powder.[3]  The only question is whether the definition of "powder" under the Tariff

Schedule is broad enough to encompass this product.  The Explanatory Note 3 requires that the

entire product be composed of powders: "[t]hese preparations are classified in the heading **only**

**when** . . . (b) They are put up in the form of powders or pastes."  Customs argues that the

powders or pastes requirement applies only to the "essential constituent" and not the auxiliary

preparation which must also be part of the product to qualify.  *Def.'s Br.* at 13-14.  This is

contrary to the clear dictates of Note 3.  Auxiliary preparations under Explanatory Note 2 may be

of granule or powder form, but only powders may be considered soldering, brazing or welding

powders under Note 3.[4]

Given that it is the product as a whole and not any distinctive elements within it which

must qualify as a powder, the physical description of the product is paramount.  Plaintiff has

submitted test results of a sample which found that 63.38 percent of the subject merchandise

would pass through a 1 mm. mesh aperture.  *Pl.'s X-Mot. App.* 3.  Further, 99.74 percent of the

subject article will pass through a mesh aperture of 5 mm.  *Id.*  The product itself appears to be a

composite of small metallic pellets, granules and powder.  It is often referred to as "welding

powder."

Customs asks the court to rely on common definitions of the term "powder" culled from

---

[3] The court finds the product is not put up in the form of a powder; therefore, it need not reach the issue of whether metal is the "essential constituent."

[4] Adhering to a requirement that the entire product be "put up in powder" form relieves Defendant of the responsibility of proving that all of the larger elements are iron oxide or aluminum and not steel.  Under Customs' proposed interpretation, only the "auxiliary preparation" can include non-powder elements, the metal must be in powder form.  Customs has not offered any proof that the non-powder portions of the subject merchandise are solely iron oxide and aluminum.  Considering that the steel filler is also referred to as "steel shot" it is unlikely Customs could meet such a narrow definition.  *See AREMA Manual* Section 2.5.

non-scientific or trade-specific references. *See Def.'s Br.* at 14-15. The definitions provided by Defendant rely on common phrases to describe a powder: "finely divided state" (*Webster's Ninth New Collegiate Dictionary* (1991)); "extremely small pieces" (*Cambridge Int'l Dictionary of English* (2002)); "tiny loose particles" (*Ultra Lingua English Dictionary* (2001)); "fine particles or dust" (*The Columbia Encyclopedia* (6th ed. 2001). *Webster's Third International Dictionary* (3d ed. 1993) defines powder as a "substance composed of fine particles." It defines "fine" as "very small" or "not coarse." Clearly a large portion, but not all, of the subject merchandise meets this definition.

Defendant points out that the Explanatory Notes to 3810 use two terms, "powder" and "granules." In its description of auxiliary preparations it states that the "group also includes mixtures of aluminum granules or powder." *Webster's Third International* defines granule as "a small particle. *The Oxford English Dictionary* (2d ed. 1989) defines it as "a small grain, a small compact particle; a pellet." These common definitions indicate significant overlap with the definitions of "powder" cited by the Defendant. Because the Notes use both terms, it appears to be the intent of the Tariff Schedule that they should not be given the same definition. *See Productol Chem. Co. v. United States*, 74 Cust. Ct. 138, 151 (1975); *see also Washington Hospital Center v. Bowen*, 795 F.2d 139, 146 (D.C. Cir. 1986) (the use of different language presumes Congress intended different meanings) (citation omitted). In distinguishing between small particles which are in the form of a powder, and small particles which are not, the common dictionary definitions are useful which indicate that powder is more fine -- that is, smaller than granules.

When the court is required to determine the difference between the words "powder" and

"granule," and the Explanatory Notes do not provide a method within that chapter, then the court must look to other sources. An examination of several of those sources indicates that the subject merchandise cannot be considered a powder within the meaning assigned by the Tariff Schedule, even though it is partially composed of powder.[5]

Explanatory Note 3(b) to Heading 3810 states that "preparations consisting solely of metallic powders, whether or not mixed together, are **excluded (Chapter 71** or **Section XV** according to their constituents)" (emphasis in original). Plaintiff urges that this explanation serves to apply the definition of "powder" found in HTSUS Section XV for metallic powders to metallic powders in heading 3810. The HTSUS Notes for Section XV state at 6 (now 8(b)) that powders are "[p]roducts of which 90 percent or more by weight passes through a sieve having a mesh aperture of 1 mm." The HTSUS Notes to Section XV further state that this definition is applicable "[i]n this section" indicating that it may not be applicable across the Tariff Schedule. However, the Explanatory Notes to heading 3810 clearly require that powders consisting solely of metallic powders should be classified under Chapter 71 or Section XV. Therefore, Plaintiff argues, the 1 mm. definition is also applicable for understanding the Explanatory Notes to 3810 because the definition in Section XV is incorporated by reference. Defendant disagrees and argues that the 1 mm. requirement refers only to products of Section XV. Were the court to adopt Defendant's interpretation, some products could be considered powders and, therefore, be excluded from heading 3810 according to the Explanatory Notes to that heading, but not meet the stricter definition of powder under Section XV and, consequently, be excluded from those

---

[5] Defendant notes that within the industry the product is sometimes referred to as a powder. *See Def.'s Br.* at 12. While product name may be used to make out a *prima facie* case as to the nature of the product, it does not assist the court in determining the legal question as to the scope of the subheading. *See United States v. Puttman*, 21 C.C.P.A. 135, 138 (1933).

headings as well. Customs' use of conflicting definitions of powder would lead to excluding a product from both applicable headings based on two different definitions of the same word. It is a standard rule of statutory interpretation that "where the same word or phrase is used in different parts of the same statute, it will be presumed, in the absence of any clear indication of a contrary intent to be used in the same sense throughout the statute." *Productol*, 74 Cust. Ct. at 151 (citations omitted).

Plaintiff also relies on two scientific reference sources. Volume 14 of the *McGraw Hill Encyclopedia of Science and Technology* (8th ed. 1997) states:

> Typically, metal powders for commercial use range from 1 to 1200 micrometers. For most applications, powder purity is higher than 99.5%.

*Powder Metallurgy Science,* Randal M. Germain, Metal Powder Industries Federation (2d. ed. 1994) states: "First, a powder is defined as a finely divided solid, smaller than 1 mm. in its maximum dimension."

Finally, the court also notes that the only Customs laboratory report to consider the issue of whether the subject merchandise is a powder or granule unequivocally stated that "[m]ost of the particles are over 1000 micrometers and thus the sample should not be considered a powder." Lab Report No. 3-95-31062-00 in *Pl.'s X-Mot. Ex.* 14.

The court finds that the definition of powder found in scientific reference sources and other parts of the Tariff Schedule, requiring that at least 90 percent of the merchandise meet the 1 mm. standard, is consistent with the "finely divided state" definition found in common language dictionaries. Therefore, the common and commercial meanings the court uses for guidance in construing the word powder are the same. The Federal Circuit has spoken to this question.

This is not a case in which there is a conflict between the dictionary meanings and a commercial standard. *See Rohm & Haas Co. v. United States*, 727 F.2d 1095, 1097-98 (Fed. Cir.1984); *Winter-Wolff, Inc. v. United States,* 996 F. Supp. 1258, 1263 [CIT 1998]. Rather, it involves an authoritative industry source that is generally consistent with the dictionary definitions and has been used to supplement the dictionary definitions with additional necessary precision. *See Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789-90 (Fed. Cir.1988).

*Rocknel Fastener*, 267 F.3d at 1361.

Therefore, the court reads the definitions drawn from the industry and scientific publications in conjunction with those found in the general English language dictionaries. The 1 mm. definition provides a specific standard to distinguish between the common definitions of granule (small particles) and powder (very small particles). In the words of the Federal Circuit, the 1 mm. definition supplements "the dictionary definitions with additional necessary precision." *Id.* The subject merchandise, according to laboratory tests submitted by both Plaintiff and Defendant, does not meet the more precise standard of at least 90 percent of the product fitting through a 1 mm. aperture. Therefore, it cannot be considered powder for purposes of classification under subheading 3810.10.00.[6]

### B.      The product is an "Auxiliary Preparation".

The term "auxiliary preparation" covers the subject merchandise. The Explanatory Notes' description of an auxiliary preparation is nearly identical to the name of the product and the description of its function under the AREMA standards. The product is referred to as an

---

[6] The court notes that such a reading is consistent with the laboratory reports prepared by Chicago and Detroit which provide the foundation for granting of Railtech's initial protest. Under *Skidmore,* consistency of action by an agency is a factor to determine how much deference to grant a decision. *See* 323 U.S. at 140. Customs' multiple and contradictory determinations in this case undermine such deference to its final determination.

aluminothermic welding charge, *Def.'s St. of Facts* ¶ 2, that mirrors the name in French: "Charge aluminothermique pour procede," *id.* ¶ 1.  The Explanatory Notes describe an auxiliary preparation as including "mixtures of aluminium granules or powder with various metallic oxides (e.g., iron oxide) used as intense heat-generators (alumino-thermic process) in welding operations."

The only variation between the description in the Explanatory Notes and the product at issue is the addition of the filler steel shot.  This addition does not prevent the product from being specifically encompassed by the term "auxiliary preparation."  "Where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears." *H.T. Kennedy Co. v. United States*, 32 Cust. Ct. 124, 127 (1954) (internal quotations omitted).  In fact, the description of how the "charge" operates provided for in the *AREMA Manual* indicates that the preparation will include "pre-alloyed steel shot in the mixture."  Section 2.5.1 (a).

Similarly, the *Welding Handbook*, excerpted in the Defendant's appendix, supports a definition of auxiliary preparation as including substances in addition to the metal oxide and aluminum: "Filler metal, when used, is obtained from the liquid metal." *Welding Handbook* at 396.  The *Welding Handbook* also indicates that the "most common application of the process is the welding of rail sections into continuous lengths." *Id.* at 397.  To accept Customs' restricted definition of auxiliary preparation would require ignoring what Customs' own exhibit refers to as the "most common application."  It is clear that the subject merchandise imported by Plaintiff is a type of auxiliary preparation used in welding.  The steel filler improves the operation of the preparation; it does not change it into a different product.  The aluminothermic charge with steel

shot filler is an auxiliary preparation mixture including steel shot used in welding.  Expressed in different terms, it is a preparation *with* steel shot; it is not a preparation *and* steel shot.[7]

The Explanatory Notes explicitly include the most basic type of aluminothermic charge, consisting of aluminum and iron oxide.  *See Bausch & Lomb, Inc. v. United States*, 21 CIT 166, 174-75, 957 F. Supp. 281, 288 (1997) (Explanatory Notes are particularly persuasive when they expressly include the article at issue).  Further, the Explanatory Notes are inclusive, not exclusive, in their description.  ("This group also includes mixtures of aluminum granules or powder with various metallic oxides . . . .")  Here, also, the Notes do not contain any limiting language such as "solely composed of" or "only."  The welding and railroad engineering manuals provide evidence that it is common for metal filler to be included within the mixture.  This does not alter what the product is, only its specific method of application.  To interpret the subheading along the lines urged by Customs would make any mixture containing a substance beyond aluminum and metal oxide incapable of being classified under this subheading.  The manuals cited above indicate that many, if not most, of the mixtures using a thermite charge include additional materials.  Plaintiff and Defendant both acknowledge that the steel shot plays a crucial, possibly essential role in the proper functioning of this product.  It is difficult to believe a subheading created to cover a specific kind of product would exclude the most common types of that product.

---

[7] Having determined that "auxiliary preparation" encompasses the entire product, the court need not employ GRI 3, which governs classification of mixtures, "*prima facie*, classifiable under two or more headings."

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is granted.

Defendant's Cross-Motion for Summary Judgment is denied.  Judgment will be entered

accordingly.


Dated:_____               _____
    New York, NY                               Judith M. Barzilay
                                                Judge